**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**John Dale RAMSDALE, Charles**
**Christoferson, Defendants–**
**Appellants.**

**No. 93–2392.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 17, 1995.

---

Marcia G. Shein, Richard D. Biggs, Barbara A. Leitner, Miller & Shein, Atlanta, GA, for John Dale Ramsdale.

Pamela A. Moine, Asst. U.S. Atty., Pensacola, FL, for appellee.

Leo A. Thomas, Pensacola, FL, for Charles Christoferson.

Before KRAVITCH and BIRCH, Circuit Judges, and GOODWIN [*], Senior Circuit Judge.

KRAVITCH, Circuit Judge:

A jury convicted Appellants John Dale Ramsdale and Charles Christoferson of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. The district court sentenced each Appellant to 360 months imprisonment. Ramsdale and Christoferson both appeal their convictions and sentences. We AFFIRM Appellants' convictions, but because the district court failed to make any findings as to the type of methamphetamine involved in the conspiracy, we VACATE the sentences imposed and REMAND for resentencing.

## I. Facts and Background

This case arises out of a scheme to transport phenylacetic acid ("PA"), a listed precursor chemical [1] used in the manufacture of methamphetamine, from Florida to Oregon.

Between August 1991 and February 1992, Matt Reed sold approximately $40,000 worth of methamphetamine in Newport, Oregon, for Ramsdale and Christoferson. When Reed mentioned to Christoferson that he was considering visiting a friend in Florida, Christoferson offered to give Reed a better price on methamphetamine in exchange for obtaining PA in Florida. He also instructed Reed on how to repackage the PA for shipment to Oregon. Reed contacted Mark Beachy, a Florida resident, and asked for his assistance in purchasing PA.

Ramsdale gave Reed $5,000 to cover the Florida trip expenses and the purchase of the PA. Reed stayed at Beachy's residence in Florida and, in return for Beachy's assistance, Reed paid some of Beachy's household bills. Reed put a message on an answering machine at Beachy's residence with a bogus perfume company's name,[2] so as to appear that he had a legitimate use for the PA.[3] While in Florida, Reed remained in touch with Ramsdale and Christoferson through calls to their homes and cellular phones. In turn, Ramsdale called Beachy's residence to check on Reed.

Claiming to be Beachy, Reed contacted Basic Chemicals, Inc. regarding the purchase of PA.[4] Rick Spooner, of Basic Chemicals, believed it might be illegal to sell the PA without notifying the proper authorities; accordingly, he contacted the Drug Enforcement Agency ("DEA"). The DEA set up a surveillance operation in connection with the PA purchase. Spooner subsequently tape-recorded a conversation with Reed (identifying himself as Beachy) during which Spooner provided Reed with price information on the PA,[5] and told Reed that a down payment

---

[*] Honorable Alfred T. Goodwin, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

[1]. "The term *listed precursor chemical* means a chemical specifically designated by the Administrator ... that, in addition to legitimate uses, is used in manufacturing a controlled substance in violation of this title and is critical to the creation of a controlled substance." 21 C.F.R. § 1310.01 (emphasis in original). *See also* 21 U.S.C. § 802(34)(H); U.S.S.G. § 2D1.11, comment. (backg'd.); 21 C.F.R. § 1310.02.

[2]. "Original Scents, Incorporated."

[3]. Reed thought that PA was used in the manufacture of synthetic perfume.

[4]. Reed purportedly believed that only Florida residents could legally buy PA. Consequently, he posed as Beachy in his telephone contacts with Basic Chemical, and had Beachy make all in-person contacts with the company.

[5]. The sale price was approximately double the normal price of PA. This apparently was a trick to identify customers purchasing chemicals for illicit purposes who might not know the correct industry prices for such items.

would be required. On or about December 12, 1991, Beachy went to Basic Chemicals and placed a $1,700 cash down-payment for the PA; this transaction was videotaped by the DEA. A few weeks later, while Reed waited outside in a truck, Beachy picked up the PA and paid another $981 in cash. Although the order was for 21 kilograms of PA, due to factory production problems, only 15.5 kilograms were delivered to Beachy.

After picking up the PA, Reed and Beachy drove to a parking lot where Reed transferred the PA to plastic freezer bags, as per Christoferson's instructions.[6] Reed then placed the PA in a black duffel bag which he transported back to Oregon by bus. DEA agents followed Beachy and stopped him after they observed him disposing of the empty PA containers. Following his arrest, Beachy admitted assisting Reed in the PA purchase and agreed to cooperate with law enforcement officials.

Back in Oregon, Reed delivered the duffel bag containing the PA to Christoferson. Two to three weeks later, Reed resumed selling methamphetamine, which Christoferson provided at a discounted rate. On January 15, 1992, Beachy and Reed spoke on the phone; Beachy, then cooperating with the authorities, inquired as to the status of the methamphetamine production and asked about getting a sample. Reed told Beachy that "they" intended to continue using Beachy to purchase PA and that Beachy would receive money for his assistance. Reed stated that once the back-ordered PA from the first shipment was received, they would try to order 15 kilograms of PA every three weeks. Ramsdale also spoke with

Beachy, promising to assist him in getting Reed to pay outstanding phone bills from Reed's visit.

In February 1992, Reed was arrested at a motel in Newport, Oregon, with methamphetamine in his possession. Ramsdale subsequently provided $5,000 for Reed's attorneys' fees, as per an earlier agreement. On May 13, 1992, an Oregon state narcotics officer stopped a vehicle in which Ramsdale was a passenger. The officer, realizing that there was an outstanding arrest warrant for Ramsdale, arrested him. Ramsdale had 12.8 grams of methamphetamine and $1,074 in cash in his possession.

Reed and Beachy both were indicted for offenses arising out of their possession of the PA;[7] they pleaded guilty and cooperated with authorities in the present case.

## II. *Sufficiency of the Evidence*

On appeal, Christoferson argues that the district court erred in failing to grant his motion for a judgment of acquittal.[8] Ramsdale also contends that there was insufficient evidence to support his conviction.[9] We review sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the government. *See United States v. Muscatell,* 42 F.3d 627, 632 (11th Cir. 1995), *cert. denied,* — U.S. —, 115 S.Ct. 2617, 132 L.Ed.2d 859 (1995). All reasonable inferences and credibility choices are made in favor of the jury verdict. *United States v. Young,* 39 F.3d 1561, 1565 (11th Cir.1994). "We ask whether a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the

---

6. Prior to the transfer of the PA, the DEA hid an electronic transmitter in the original PA packing.

7. Both Beachy and Reed were charged with possession of a chemical with intent to manufacture a Schedule I controlled substance, in violation of 21 U.S.C. § 841(d)(2).

8. Both defendants timely moved for a judgment of acquittal at the close of the government's case. Neither presented a case in defense.

9. Ramsdale also claims that there was an impermissible variance between the allegations in the indictment and the facts established at trial. *See United States v. Young,* 39 F.3d 1561, 1566 (11th Cir.1994) ("A variance occurs when the facts

proved at trial deviate from the facts contained in the indictment but the essential elements of the offense are the same."). Assuming, *arguendo,* that there was a variance in this case, Ramsdale has failed to demonstrate that he was substantially prejudiced. *See United States v. Reed,* 980 F.2d 1568, 1581 (11th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 3063, 125 L.Ed.2d 745 (1993). There is simply no indication that "the proof at trial differ[ed] so greatly from the charges in the indictment that the defendant [was] unfairly surprised and had an inadequate opportunity to prepare a defense." *Id.* at 1583. As such, this argument fails.

defendant guilty beyond a reasonable doubt." *United States v. Cannon*, 41 F.3d 1462, 1466 (11th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 86, — L.Ed.2d — (1995). The evidence need not exclude every reasonable hypothesis of innocence. *United States v. Perez–Tosta*, 36 F.3d 1552, 1556 (11th Cir. 1994), *cert. denied,* — U.S. —, 115 S.Ct. 2584, 132 L.Ed.2d 833 (1995).

■ To sustain Appellants' convictions for conspiracy, the evidence must show: (1) that a conspiracy existed, (2) that Ramsdale and Christoferson knew of it, and (3) that they knowingly and voluntarily joined it. *Id.* at 1557. Participation in a criminal conspiracy need not be proved by direct evidence; rather, a common purpose and plan may be inferred from a "development and collocation of circumstances." *Id.* (quoting *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469–70, 86 L.Ed. 680 (1942) (quoting *U.S. v. Manton*, 107 F.2d 834, 839 (2d Cir.1939))).

■ The evidence in this case supports the jury's verdict.[10] Ramsdale and Christoferson provided Reed with methamphetamine to sell in Oregon. In exchange for acquiring the PA, Christoferson gave Reed better prices on methamphetamine. Christoferson explained how to repackage the PA for the trip back to Oregon and accepted the PA from Reed upon his return. Ramsdale provided money for the purchase of the PA and Reed's airline ticket for the trip down to Florida. Telephone records and testimony indicated that Appellants monitored Reed's progress during his time in Florida. Furthermore, after Reed was arrested, Ramsdale provided him with funds for an attorney.

The jury also heard testimony regarding two vehicle stops. On September 21, 1991, when Christoferson's vehicle was stopped for a defective rear license, he had in his possession: 3.05 grams of methamphetamine, sectioned off into squares; $7801 in cash, most of it in twenties and fifties; a shotgun with a laser sight; and a .9 millimeter pistol. Ramsdale possessed 12.8 grams of metham-

phetamine and over $1074 in cash when a vehicle in which he was travelling was stopped and he was arrested.

Based upon the foregoing evidence, we conclude that "a reasonable trier of fact, when choosing among reasonable constructions of the evidence, could have found the defendant[s] guilty beyond a reasonable doubt." *Cannon*, 41 F.3d at 1466.

### III. *Vehicle Stop Evidence*

■ Christoferson argues that the district court erred by allowing Officer Chantal Marie Thomas to testify regarding the stop of Christoferson's vehicle on September 21, 1991. We review the trial court's admission of evidence for abuse of discretion. *Perez–Tosta*, 36 F.3d at 1560.

Fed.R.Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Nevertheless, as this court previously has explained:

> Evidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.

*United States v. Veltmann*, 6 F.3d 1483, 1498 (11th Cir.1993); *see also United States v. Weeks*, 716 F.2d 830, 832 (11th Cir.1983) (per curiam).

■ Christoferson's vehicle stop occurred during the time of the conspiracy as charged in the indictment. Christoferson possessed methamphetamine, the same drug that he was accused of conspiring to manufacture. The amount of money in the vehicle and the fact that the methamphetamine was sectioned off into squares, with a portion removed, supported the inference that Christoferson was selling methamphetamine. Of-

---

10. That the government's case was heavily dependent on Reed's testimony does not affect our conclusion. Credibility determinations are for the factfinder and should not ordinarily be tam-

pered with on appeal. *See United States v. Copeland*, 20 F.3d 412, 413 (11th Cir.1994) (per curiam).

ficer Thomas also noted, as has this court on numerous prior occasions, that the presence of weapons supported the conclusion that Christoferson was dealing or manufacturing drugs. *See United States v. Terzado–Madruga,* 897 F.2d 1099, 1120 (11th Cir.1990) ("It is uniformly recognized that weapons are often as much 'tools of the trade' as the most commonly recognized narcotics paraphernalia."); *United States v. Cruz,* 805 F.2d 1464, 1474 (11th Cir.1986) (observing that "numerous cases have recognized that guns are a tool of the drug trade" and that there is a "frequent and powerful connection between the use of firearms and narcotics traffic"), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1631, 95 L.Ed.2d 204, *and cert. denied,* 482 U.S. 930, 107 S.Ct. 3215, 96 L.Ed.2d 702 (1987).

Evidence of possession of the drug which Christoferson was accused of conspiring to manufacture, during the period of time alleged in the indictment, and under circumstances which suggested drug trafficking, is not extrinsic evidence within the meaning of 404(b). This incident both "was inextricably intertwined with the evidence regarding the charged offense" and "was necessary to complete the story" of Christoferson's role in the charged offense. *Weeks,* 716 F.2d at 832. Accordingly, the district court did not abuse its discretion by allowing the officer to testify. *See United States v. Wells,* 995 F.2d 189, 192 (11th Cir.1993) (possession of four pounds of methamphetamine related directly to charged offenses of conspiracy to manufacture and distribute methamphetamine and hence did not constitute "other crimes" evidence under Fed.R.Evid. 404(b)).

## IV. *Sentencing Challenges*

### A. *Role in the Offense*

■ Christoferson and Ramsdale contend that the district court erred by adjusting their offense levels upward two levels for their role as co-organizers in the offense pursuant to U.S.S.G. § 3B1.1.[11] This court reviews a sentencing court's determination of

a defendant's role in the crime for clear error. *United States v. Young,* 39 F.3d 1561, 1568 (11th Cir.1994). U.S.S.G. § 3B1.1, comment. (n. 4) states that the following factors should be considered in distinguishing a leadership and organizational role from one of mere management:

> The exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Furthermore, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.*

■ The district court did not clearly err in assessing Appellants' two-point enhancements on the facts of this case. Christoferson recruited Reed by offering him discount prices on methamphetamine in exchange for Reed's acquisition of PA in Florida. Christoferson also instructed Reed on how to repackage the PA for the trip back to Oregon and collected the PA from Reed upon his return. Ramsdale provided funding for the criminal endeavor and gave Reed money for attorneys' fees after his arrest. Appellants also monitored Reed's progress in Florida. The evidence suggested that Ramsdale and Christoferson stood to profit more than Reed or Beachy from this conspiracy. The record thus amply supported the imposition of this two-level increase.

### B. *Methamphetamine Sentencing Issues*

■ Finally, Christoferson argues that the trial court erred: (1) by applying a one-to-one ratio between the PA and the methamphetamine and (2) in sentencing him based upon D-methamphetamine rather than

---

11. Ramsdale also asserts that the district court violated former Fed.R.Crim.P. 32(c)(3)(d) (now Fed.R.Crim.P. 32(c)(1)), by failing to make explicit findings of fact as to his role in the offense. Because the record before us sufficiently facili-

tates meaningful appellate review of this claim, we choose to address this issue on the merits. *See United States v. Villarino,* 930 F.2d 1527, 1528–29 (11th Cir.1991).

L-methamphetamine.[12] We review the sentencing court's findings of fact for clear error and its application of law to the facts *de novo. United States v. Rojas,* 47 F.3d 1078, 1080 (11th Cir.1995). A district court's determination of the quantity of drugs attributable to a particular defendant is subject to reversal only if it was clearly erroneous. *See United States v. Lawrence,* 47 F.3d 1559, 1565 (11th Cir.1995); *Young,* 39 F.3d at 1572.

### 1.

■■ Christoferson's argument regarding the one-to-one equivalency ratio between the PA allegedly ordered and the methamphetamine attributed to him is without merit. The only evidence before the sentencing court on this issue was the trial testimony of DEA forensic chemist Joey Clark, who stated (during Ramsdale's cross-examination): "Phenylacetic acid to methamphetamine, based upon a 100 percent theoretical yield will yield slightly more than a one to one ratio, like a 1.2. So if you started with one kilogram and converted it to meth and got 100 percent yield you would wind up with 1.1 kilogram of methamphetamine." No contrary evidence was introduced, nor did either Appellant offer an alternative method for computing the ratio of PA to methamphetamine. In light of the lack of evidence to the contrary, we cannot say that the district court clearly erred in adopting the one-to-one ratio.[13] *See United States v. Newsome,* 998 F.2d 1571, 1577–78 (11th Cir.1993) (court did not clearly err by sentencing based upon 4.99 kilograms of methamphetamine which represented the projected yield of 4.12 kilograms of methamphetamine oil discovered, where defendants did not offer any rebuttal evidence), *cert. denied,* — U.S. —, 114 S.Ct. 734, 126 L.Ed.2d 698, *and cert. denied,* — U.S. —, 114 S.Ct. 737, 126 L.Ed.2d 700 (1994).

### 2.

■■ We now turn to Appellants' argument that the district court erred in imposing sentence based upon D-methamphetamine rather than L-methamphetamine. We addressed the proper sentencing procedure for methamphetamine in *United States v. Patrick,* 983 F.2d 206 (11th Cir.1993). In *Patrick,* this court observed that "[t]he involvement of regular D-methamphetamine requires a significantly harsher sentence under the sentencing guidelines than for an equal quantity of L-methamphetamine." *Id.* at 208 (citing U.S.S.G. § 2D1.1). We therefore held that the government bears the burden of production and persuasion as to the type of methamphetamine involved in the offense. *Id.* Because the government had failed to meet its burden in *Patrick,* we vacated Patrick's sentence, which the district court had imposed based upon D-methamphetamine, and remanded for resentencing. *Id.* at 211.

In this case, the government failed to produce any evidence regarding the type of methamphetamine involved in the conspiracy. Appellants concede, nevertheless, that they did not raise this argument before the district court.[14] Because Appellants failed to object at sentencing, we review the district court's imposition of a sentence based upon D-methamphetamine for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Weir,* 51 F.3d 1031, 1032 (11th Cir.1995) ("[A] party's failure to object to the sentencing court's findings of fact and conclusions of law waives

12. At the beginning of oral argument, Appellant Ramsdale asked the court to permit him to adopt Christoferson's argument as to the type of methamphetamine involved in this offense. Because the government is not prejudiced by this entreaty, nor has it inconvenienced the court, we have granted the request.

13. Christoferson directs our attention to cases in which this court approved district court findings of less than one-to-one ratios. *See, e.g., United States v. Carroll,* 6 F.3d 735 (11th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994); *United States v. Hyde,* 977 F.2d 1436 (11th Cir.1992), *cert. denied,* — U.S.

—, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993). In those cases, however, the sentencing court determined acceptable ratios based upon the evidence presented by the parties. The only evidence presented to the district court at sentencing in the present case was the unchallenged testimony of a forensic chemist.

14. This is in contrast to *Patrick,* where the district court was "apprised of the possibility of multiple meanings during the course of the trial and upon Patrick's objection to the government's scoring of the drug at the sentencing hearing." *Id.* at 210.

any objection for appeal purposes, unless this would result in manifest injustice.") (citing *United States v. Jones*, 899 F.2d 1097, 1102–03 (11th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds*, *United States v. Morrill*, 984 F.2d 1136, 1137 (11th Cir.1993) (en banc)).

The question before us is whether it is plain error to impose a sentence based upon D-methamphetamine in the absence of *any* evidence as to the type of methamphetamine involved in the criminal activity. Although we have yet to address this precise issue, other circuits have expressed varying views on the matter. In *United States v. Deninno*, 29 F.3d 572, 580 (10th Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995), the Tenth Circuit held that by failing to make any objections to the sentencing court as to the type of the methamphetamine, the defendant had waived the issue for appeal.[15] The Third Circuit, however, reached a contrary conclusion in *United States v. Bogusz*, 43 F.3d 82, 90 (3d Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995). The *Bogusz* court explained: "[C]onsidering the magnitude of the difference in sentencing that could result from the application of the wrong organic isomer, we think the sentencing court's failure to make this determination would result in a grave miscarriage of justice."[16]

▪ We agree with the Third Circuit. To satisfy the plain error standard, a party must demonstrate that: (1) there was an error in the district court's action; (2) such error was plain, clear, or obvious, and (3) the error affected substantial rights, in that it was prejudicial and not harmless. *United States v. Foree*, 43 F.3d 1572, 1578 (11th Cir.1995) (citing *United States v. Olano*, — U.S. —, — – —, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993)). At oral argument, the government conceded that sentencing based upon D-methamphetamine, rather than L-methamphetamine, makes a substantial difference in the sentence imposed.[17]

*Patrick* was decided on February 12, 1993 and the sentencing hearing in this case took place on April 5, 1993. The government and the district court were thus on notice of the government's obligation to prove the type of methamphetamine. We also note that the presentence investigation reports ("PSIs") make no mention of the type of methamphetamine involved in the offense; U.S.S.G. § 2D1.1(c)(3) is applied in the PSIs to determine Appellants' base offense levels without further comment. Thus, Appellants were in the position where they would have had to object to an *implied* factual finding, one neither addressed by the court nor the government.

On the facts before us, we conclude that it was plain error to sentence Ramsdale and Christoferson on the basis of D-methamphetamine. The government and the district court should have known that findings as to the type of methamphetamine were required. The failure to make such findings had a profound impact on the range of possible sentences imposed. Accordingly, we VACATE Ramsdale's and Christoferson's sentences and REMAND for resentencing, at which time the government must meet its burden of proof under *Patrick*.[18]

---

**15.** The Tenth Circuit reasoned that although the burden of proof was on the government, the burden of alleging factual inaccuracies in the presentence report was on Deninno, and "factual disputes do not rise to the level of plain error." *Deninno*, 29 F.3d at 580.

**16.** The language in *Bogusz* is arguably dictum, as the court first held that the Appellants' general objections had preserved the issue for appeal. *Bogusz*, 43 F.3d at 89.

**17.** The U.S. Sentencing Commission recently proposed eliminating altogether the distinction between D- and L-methamphetamine in the Sentencing Guidelines. *See Amendments to the Federal Sentencing Guidelines, Policy Statements and*

*Official Commentary*, 57 Crim.L.Rep. (BNA) 2095, 2100, 2101 (May 10, 1995).

**18.** Christoferson also argues that the trial court erred in holding him responsible for 42 kilograms of methamphetamine, as there was no proof that he was capable of producing this amount and the second order of PA was too uncertain. We express no opinion as to the merits of these claims. The district court failed to append its findings on this issue to the presentence report, as required by Fed.R.Crim.P. 32(c)(1). After reviewing the record, we cannot be certain upon what specific evidence the district court relied in determining Christoferson's sentence. *See generally Lawrence*, 47 F.3d at

AFFIRMED in part, VACATED and RE-MANDED in part.

1566–68 (describing proper process for determining amount of drugs attributable to a particular defendant). On remand, the district court should explicitly state the basis for attributing in excess of 21 kilograms of methamphetamine to Christoferson, and if necessary, engage in further factfinding to support its determination.